UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| ROBERT T. BRIAR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Civil Action No. CV-00-S-3510-S |
| ) | |
| USX CORPORATION, U.S. STEEL ) | |
| GROUP, FAIRFIELD WORKS ) | |
| DIVISION, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

Plaintiff, Robert T. Briar, asserts a claim under the Americans with Disabilities Act of 1990 for his former employer's discrimination on the basis of disability. The action presently is before the court on the motion of defendant USX Corporation for summary judgment (doc. no. 8). Upon consideration of the pleadings, briefs, and evidentiary submissions, the court concludes the motion is due to be granted.

**I. STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct.

2548, 2553, 91 L.Ed.2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)) (internal quotation marks and citations omitted); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

## II. FACTUAL BACKGROUND

Robert Briar was employed as an "FCR Operator"[1] in the pipe mill at USX Corporation's Fairfield Works from February of 1993[2] until April of 2000, when he began receiving short-term disability — so-called "sickness and accident" — benefits. Fairfield Works is a fully integrated mill where steel is produced from raw materials (iron ore, coke, and limestone). The steel is cast into slabs or "rounds," which are converted to steel pipe in the pipe mill.[3]

There are three work shifts at the mill: the "A shift" (11:00 p.m. until 7:00 a.m.); the "B shift" (7:00 a.m. until 3:00 p.m.); and the "C shift" (3:00 p.m. until 11:00 p.m.).[4] Briar was required to work rotating shifts — *i.e.,* he was scheduled to work the A shift one week, the B shift the

---

[1] The record does not indicate what "FCR" represents; however, in his brief, Briar also refers to his job title as "Facing Machine Operator." Memorandum in Opposition to Defendant's Motion for Summary Judgment, doc. no. 14, at 5.

[2] Briar has worked for USX Corporation since September 13, 1973. USX Corporation's Evidentiary Submission in Support of its Motion for Summary Judgment (doc. no. 9), Ex. 1, at 64.

[3] *Id.*, Ex. 2.

[4] *Id.*, Ex. 3, at 28-29.

following week, the C shift the week after that, and then around again.[5] The workers were permitted to trade shifts, and Briar swapped as many of the A shifts as he could.[6]

Briar experienced problems sleeping when he worked the A, or 11:00 p.m. to 7:00 a.m. shift.[7] Specifically, he said that he had difficulty falling asleep, and he was unable to sleep more than one hour at a time. Briar said that, when he worked the A shift, he drank coffee and moved around to avoid falling asleep.[8] His doctor prescribed medication to help him sleep, but Briar did not fill the prescription.[9]

Briar called his supervisor, Jeff Easton, who was the general manager, during the last week of April of 2000, and told Easton that he was unable to work the night shift.[10] He told Easton that he had a letter from his doctor, and Easton referred him to the Fairfield Works' medical center.[11]

Dr. Cheryl Szabo, medical director of that center, saw Briar on May 4, 2000. Briar presented a letter from his physician, Erin M. Ozgun, M.D., dated May 2, 2000, which stated:

> Mr. Robert T. Blair is followed by me with multiple sleep disorders including obstructive sleep apnea, a circadian rhythm disorder and shift work sleep disorder. He is unable to adapt to rotating shifts. His excessive sleepiness that he encounters when he works the night shift is posing a real threat to him because of motor vehicle accidents. It is my advice that he stay home from work for this week and refrain working rotating shifts, especially night shifts in the future.[12]

Dr. Szabo's record of Briar's visit reads as follows:

---

[5] *Id.* at 28.

[6] *Id.* at 29. Briar said that in the year before he stopped working, it had become more difficult to trade shifts. *Id.* at 31.

[7] *Id.* at 44.

[8] *Id.* at 53.

[9] *Id.* at 62.

[10] *Id.* at 32.

[11] *Id.*

[12] Plaintiff's Motion in Opposition to Defendant's Motion for Summary Judgment (doc. no. 13), Ex. 1.

> Mr. Briar came into the clinic today sent by Jeff Easton with a letter from his physician requesting accommodation for sleep disorder problem involving primarily the restriction of rotating shifts. Mr. Briar states that he has had difficulty sleeping for many years. He has been tried on every prescription medication available for sleep without success. Recently he under went [sic] sleep study at Princeton with Dr. Ozgun. He has an appointment with him in follow-up on May 30th. He is currently on no medications. He says he is on immunotherapy for allergies. Since returning from the layoff, Mr. Briar has worked Monday thru Friday and has had weekends off.[13]

After obtaining a release from Briar, Dr. Szabo telephoned Dr. Ozgun to discuss the work restriction. According to Dr. Szabo's notes, Dr. Ozgun informed her that Briar's obstructive sleep apnea was minimal, and that he believed Briar's main problems were circadian rhythm disorder and anxiety. He also told her that Briar's history indicated that he had overused benzodiazepines, and, as a result, prescription sleep aids were ineffective. Dr. Ozgun opined that Briar would be able to rotate between the 7:00 a.m. to 3:00 p.m. "B" shift and the 3:00 p.m. to 11:00 p.m. "C" shift upon his return to work. Dr. Szabo and Dr. Ozgun agreed that Briar would be re-evaluated in June or July, to assess whether the restrictions should be made permanent.[14]

Dr. Szabo met with Charles Bennick, manager of defendant's personnel department, and Easton on May 5, 2000, and they discussed whether Briar could be relieved temporarily of working the 11:00 p.m. to 7:00 a.m. "A" shift. They decided that such an accommodation would be a hardship to the department. Consequently, Briar was told to file a claim for sickness and accident benefits pending his re-evaluation.[15]

Briar first filed a claim form for sickness and accident benefits on May 8, 2000. Dr. Ozgun also completed the form, listing his diagnoses as obstructive sleep apnea/hypoapnea syndrome,

---

[13] Doc. no. 9, Ex. 16, Tab A.
[14] *Id.*
[15] *Id.*

insomnia, and shift work sleep disorder. Dr. Ozgun indicated that Briar first consulted him on March 8, 2000, and listed the date that Briar would be able to return to work as "undetermined." Dr. Ozgun commented that "by his history he has debilitating insomnia when he works the night shift, *i.e.*, cannot sleep during the day."[16]

Briar submitted a second claim form dated June 1, 2000, which was completed by Dr. Ozgun on June 7, 2000. Dr. Ozgun indicated that Briar had participated in a sleep study on April 17, 2000, that he was "unable to tolerate CPAP[17] — left prior to completion of study."[18] Dr. Ozgun did not indicate a date for Briar to resume work.

Briar submitted another claim form dated June 26, 2000, which was completed by Dr. Ozgun on July 6, 2000. Dr. Ozgun indicated that Briar could return to work on July 10, 2000, but that he was unable to work the night shift.[19]

Briar did not return to work on any date during July of 2000, however. Bennick therefore informed Briar, by means of a letter dated September 12, 2000, that

> I have been advised by Aetna[20] that you were released by your physician to return to work effective July 10, 2000. As of this date you have not presented yourself for return to work evaluation.
>
> You are hereby directed to immediately report to the Fairfield Works Personnel Office preliminary to a return to work evaluation at the Plant Medical Department.
>
> Failure to report to the Personnel Office by Wednesday, September 20, 2000 could

---

[16] *Id.*, Ex. 8.

[17] Continuous Positive Air Pressure machine, used to treat obstructive sleep apnea. *See Mont-Ros v. City of West Miami*, 111 F. Supp. 2d 1338, 1346 (S.D. Fla. 2000). According to the sickness and accident benefits claim form completed by Dr. Ozgun on July 6, 2000, a second sleep study was conducted on May 30, 2000, which Briar also was unable to complete. Doc. no. 9, Ex. 8.

[18] *Id.*

[19] *Id.*

[20] Aetna Life Insurance Company was the insurance carrier that administered USX Corporation's sickness and accident benefits program. *Id.*

lead to discipline up to and including a five-day suspension subject to discharge.[21]

Briar reported to Dr. Szabo at the plant medical center on September 20, 2000, and presented a letter from Dr. Ozgun dated September 6, 2000. The letter stated:

> Mr. Robert P. Briar is followed by me for multiple sleep disorders. These include obstructive sleep apnea and a circadian rhythm disorder. He has been felt to also have a shift work sleep disorder. Because of these sleep disorders, he is unable to adapt well to rotating shifts. Thus far, he has been intolerant to CPAP because of what is felt to be an element of claustrophobia. We are currently working on this, however, because of the above disorders, it is recommended that he refrain from working rotating shifts, especially night shifts in the future. Otherwise, he is released to return to work with the restriction that he not work the night shifts.[22]

On October 12, 2000, Dr. Szabo sent a facsimile transmission to Dr. Ozgun, requesting additional information about Briar's condition. Specifically, Dr. Szabo asked the following questions:

> 1) Is his restriction of "no night shifts" permanent?
>
> 2) Has he been compliant with treatment from Psychiatry? Has he complied with your treatment?
>
> 3) Is he still under your care for obstructive sleep apnea and alleged circadian rhythm disorder? Is he still under treatment by psychiatry?[23]

Dr. Ozgun responded to the inquiry,[24] stating:

> Regarding Mr. Briar's medical conditions, restrictions, treatment and compliance with treatment, we have evaluated Mr. Briar on one occasion in the office and on two occasions in the Sleep Lab. His current diagnoses are obstructive sleep apnea and shift work sleep disorder. By his history, he is intolerant of rotating shifts, therefore, it is our recommendation that Mr. Briar not work the night shift. He should be fine working the day shift and evening shift. It is unlikely that his ability to adapt to different sleep schedules will become any better with age, therefore, his restriction

---

[21] *Id.*, Ex. 9.

[22] *Id.*, Ex. 10.

[23] *Id.*, Ex. 11.

[24] Dr. Ozgun's response to Dr. Szabo's facsimile transmission of October 12 is dated October 11. Doc. no. 13, Ex. 3.

> from working the night shift should be considered permanent. Regarding his obstructive sleep apnea, Mr. Briar was referred to a psychiatrist for evaluation and treatment of anxiety and claustrophobia. To this date I have received no communication from the psychiatrist to whom he was referred, nor did Mr. Briar keep his scheduled follow-up appointment in our office. In response to your second inquiry regarding Mr. Briar's compliance with treatment, there is no effective treatment for a shift work sleep disorder other than to limit the patient to shifts to which he would be able to adapt to. Regarding his obstructive sleep apnea, Mr. Briar did not complete his second night sleep study, and this condition remains untreated.[25]

Dr. Szabo also spoke by telephone with Dr. Ozgun about Briar, and her notes of October 16, 2000 reflect the following:

> Dr. Ozgun called responding to fax sent yesterday. Dr. Ozgun stated that "I have never done so much for a patient I have seen so little." He states that he has seen Mr. Briar only once in March. He states that his sleep apnea is mild and that all attempts to treat him failed due to Mr. Briar's complaint of claustrophobia with CPAP.[26] He was referred to psychiatry but as far as Dr. Ozgun knows, Mr. Briar has never seen psychiatry. Dr. Ozgun states in fact that he has not heard from either the psychiatrist or Mr. Briar (except in his request to fill out S&A [sickness and accident claim] forms). He stated that he thought he released Mr. Briar at the end of June and questions why we are just now dealing with return to work issues. Dr. Ozgun was advised that Mr. Briar never presented himself to medical in June/July. Dr. Ozgun states that Mr. Briar's history suggests a shift work disorder and he feels obligated to recommend day shift work permanently because of liability. He has no objective evidence of any disorder and in fact states that Mr. Briar never completed his sleep study. He states he is done with Mr. Briar and has discharged him from his care.[27]

Following receipt of this information about Briar's medical condition, Dr. Szabo, Bennick, and Bernard Borman, the plant's employee relations manager, determined that Briar's condition did not constitute a disability, because there was no objective medical evidence of his condition, and because there was no indication that Briar's condition affected his ability to perform a broad range of jobs.[28]

---

[25] *Id.*

[26] *See supra* note 17 and related text.

[27] Doc. no.9, Ex. 12.

[28] Doc. no. 13, Ex. 4, at 17.

Briar did not return to work, and, as of May of 2001, his work status was described as "non-occupational disability."[29] Briar testified that he could perform the duties of an FCR Operator if he were relieved of the requirement to work the 11:00 p.m. to 7:00 a.m. "A" shift. He also testified there were other jobs at the pipe mill he believed he could perform where rotating shifts were not required, including material handler, maintenance utility man,[30] and laborer.[31]

Briar filed a charge of discrimination with the Equal Employment Opportunity Commission on August 25, 2000, alleging that he had been denied reasonable accommodation. The EEOC issued a dismissal and notice of rights on September 5, 2000.

### III. DISCUSSION

The Americans with Disabilities Act ("ADA" or "the Act") was enacted by Congress in 1990 for the stated purpose of providing "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).[32] To achieve such

---

[29] *Id.* at 22. Apparently, Briar filed a grievance regarding his return to work pursuant to the collective bargaining agreement in place at the Fairfield Works. Doc. no. 9, Ex. 3, at 91.

[30] Briar conceded that he was not qualified as a maintenance utility man in Alabama. *Id.* at 77.

[31] *Id.* at 72-79.

[32] When considering the need for such legislation, Congress found that, "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination ... continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). Discrimination was found to persist in "critical areas" of everyday life, including "employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services." *Id.* § 12101(a)(3). Congress further found that discrimination against persons with disabilities took many forms, ranging from "outright intentional exclusion," to "failure to make modifications to existing facilities and practices." *Id.* § 12101(a)(5). Congress concluded that there was a "compelling need" for a "clear and comprehensive national mandate" to eliminate discrimination against disabled persons, and to integrate them "into the economic and social mainstream of American life." S.Rep. No. 101-116, p. 20 (1989); H.R.Rep. No. 101-485, pt. 2, p. 50 (1990); U.S.Code Cong. & Admin.News 1990, pt. 2, pp. 303, 332.

The Act as codified (42 U.S.C. § 12101 *et seq.*) is divided into three principal Subchapters, referred to as "Titles" in the original legislation. Title I (*id.* §§ 12111 – 12117) addresses discrimination in employment settings. Title II (*id.* §§ 12131 – 12165) covers discrimination in the provision of public services by governmental entities. Title III (*id.* §§ 12181 – 12189) deals with public accommodations and services provided by private entities. Title IV (*id.* §§ 12201 – 12213) addresses so-called "miscellaneous provisions."

purposes, among others, the Act provides that no covered entity,[33] including private employers,[34]

> shall discriminate against *a qualified individual with a disability* because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

*Id.* § 12112(a) (emphasis supplied). The phrase "a qualified individual with a disability" means "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8). In turn, the concept of "disability" is defined three ways — that is, as including any person: who has a "physical or mental impairment" that "substantially limits" one or more of the "major life activities" of such person; or who has "a record of such an impairment"; or who is "regarded as having such an impairment." *Id.* § 12102(2)(A) – (C); *see also* 29 C.F.R. § 1630.2(g). "An individual is deemed to be 'disabled' for purposes of the ADA if he satisfies any one of these three enumerated definitions." *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 911 (11th Cir. 1996).

The Act imposes upon employers the duty to provide "reasonable accommodations" for known disabilities, unless doing so would result in undue hardship to the employer. 42 U.S.C. § 12112(b)(5)(A).[35]

An ADA plaintiff must prove that his employer intentionally discriminated against him

---

[33] 42 U.S.C. § 12111(2) provides: "The term 'covered entity' means an employer, employment agency, labor organization, or joint labor-management committee.").

[34] 42 U.S.C. § 12111(5)(A) provides, in relevant part, that: "The term 'employer' means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person...."

[35] 42 U.S.C. § 12112(b)(5)(A) defines the term "discriminate" as including an employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant [for employment] or an employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; ...."

because of his disability. Where, as here, there is no direct evidence of a discriminatory animus, the "plaintiff may establish a prima facie case of an ADA violation through circumstantial evidence using the familiar burden-shifting analysis employed in Title VII employment discrimination cases." *Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001); *see also, e.g., Hilburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220, 1226 (11th Cir. 1999) ("The familiar burden-shifting analysis of Title VII employment discrimination actions is equally applicable to ADA claims.") (citing *Moses v. American Nonwovens, Inc.*, 97 F.3d 446, 447 (11th Cir. 1996)); *DeLuca v. Winer Industries, Inc.*, 53 F.3d 793, 797 (7th Cir. 1995) (collecting cases).

To establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate: (1) that he has a "disability" within the meaning of the Act; (2) that he is "a qualified individual with a disability," meaning that he can perform the essential functions of the employment position he holds or seeks, with or without reasonable accommodation being made by the employer;[36] and (3) that he suffered an adverse employment action because of his disability.[37] *See, e.g., Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001); *Reed v. Heil Co.*, 206 F.3d 1055, 1061 (11th Cir. 2000); *Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000); *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998); *Doe v. Dekalb County School District*, 145 F.3d 1441, 1445, 1454 (11th Cir. 1998); *Stewart v. Happy Herman's*

---

[36] *See* 42 U.S.C. § 12111(8) (defining "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires"); *see also* 29 C.F.R. § 1630.2(m) ("Qualified individual with a disability means an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position").

[37] There actually is a fourth element, implicit in the interstice between the second and third: *i.e.*, "a plaintiff must demonstrate that the employer had either actual or constructive knowledge of the disability or considered the employee to be disabled." *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 910 (11th Cir. 1996) (citing *Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996) (per curiam)).

*Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) (citing *Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir. 1996)).[38]

### A. First prima facie element: *is the plaintiff "disabled"*?

As previously noted, the ADA defines the concept of "disability" three ways. Of those, only the first is at issue here: *i.e.,* does plaintiff have a "physical or mental impairment" that "substantially limits" one or more of his "major life activities?"

#### 1. Is plaintiff's condition an "impairment"?

The ADA does not define those conditions constituting a "physical or mental impairment." Instead, that phrase, and many other significant terms in the Act, are only defined in regulations promulgated by the Equal Employment Opportunity Commission pursuant to authority delegated by Congress,[39] and, in the "Interpretive Guidance on Title I of the Americans With Disabilities Act" attached as an appendix to those regulations.[40] Even though such regulations do not bind this court, they may be relied upon "for guidance." *Gordon*, 100 F.3d at 911. The Supreme Court long has recognized that an agency's interpretation of a statute it is charged with enforcing should be given "considerable weight," and should not be disturbed unless it appears from the statute or legislative

---

[38] *See also, e.g., Pritchard v. Southern Company Services*, 92 F.3d 1130, 1132 (11th Cir) ("In order to establish a prima facie case under the Americans with Disabilities Act of 1990, ... Pritchard must show that: 1) she has a disability, 2) she is a qualified individual, and 3) she was discriminated against because of the disability"), *amended on reh'g*, 102 F.3d 1118 (11th Cir. 1996), *cert. denied*, 520 U.S. 1274, 117 S. Ct. 2453, 138 L.Ed.2d 211 (1997). Other courts of appeals have made similar findings. *See, e.g., McKay v. Toyota Motor Manufacturing*, 110 F.3d 369 (6th Cir. 1997) ("A party seeking relief under the ADA for termination must establish (1) that she is a disabled person within the meaning of the Act, (2) that she is qualified to perform the essential functions of her job with or without reasonable accommodation, and (3) that she suffered an adverse employment decision because of her disability"); *Williams v. Channel Master Satellite Systems, Inc.*, 101 F.3d 346, 348 (4th Cir. 1996) ("To establish a cause of action under the ADA, a plaintiff must demonstrate: '(1) that [s]he has a disability; (2) that [s]he is otherwise qualified for the employment or benefit in question; and (3) that [s]he was excluded from the employment or benefit due to discrimination solely on the basis of the disability'").

[39] *See* 42 U.S.C. § 12116 (requiring the EEOC to issue regulations to implement Title I of the ADA).

[40] *See* 29 C.F.R. § 1630.

-11-

history that Congress intended a different construction. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *see also, e.g., Griggs v. Duke Power Co.*, 401 U.S. 424, 433-34, 91 S.Ct. 849, 854-55, 28 L.Ed.2d 158 (1971) (administrative interpretations "entitled to great deference"). The *Chevron* standard is applied by the Eleventh Circuit in the context of ADA claims. *Harris v. H & W Contracting Co.*, 102 F.3d 516, 521 (11th Cir. 1996).

The EEOC's administrative interpretations of the ADA define the phrase "physical or mental impairment" as meaning:

> (1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or
>
> (2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h).

Briar has been diagnosed with obstructive sleep apnea, circadian rhythm disorder, and shift work sleep disorder. Thus, he suffers from a "physical or mental impairment" for purposes of the ADA.

### 2. Does plaintiff's impairment "substantially limit" a "major life activity"?

"A physical impairment, standing alone, ... is not necessarily a disability as contemplated by the ADA. ... The ADA requires that the impairment *substantially limit* one or more of the individual's *major life activities*." *Gordon*, 100 F.3d at 911 (emphasis supplied) (citations omitted).

The phrase "substantially limits" is not defined by the Act, but implementing regulations

instruct that it means a person either is:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
>
> (ii) Significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). The EEOC further instructs that courts should consider the following factors when determining whether an impairment substantially limits a major life activity: "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2).

"Major life activities" are defined by another regulation as including "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). The Appendix to that section elaborates on that definition in the following manner:

> This term adopts the definition of the term "major life activities" found in the regulations implementing section 504 of the Rehabilitation Act at 34 CFR part 104. "Major life activities" are those basic activities that the average person in the general population can perform with little or no difficulty. Major life activities include caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working. This list is not exhaustive. For example, other major life activities include, but are not limited to, sitting, standing, lifting, reaching.

29 C.F.R. Part 1630, App. § 1630.2(i) (citations omitted).

When comparing a plaintiff's ability to perform "major life activities" with the abilities of an average person in the general population, there must be more than a mere difference in abilities. A plaintiff must show instead that his impairment causes "limitations that are in fact substantial."

*Albertsons, Inc. v. Kirkingburg*, 527 U.S. 555, 565, 119 S. Ct. 2162, 2168, 144 L.Ed.2d 518 (1999).

Thus, the determination of whether an individual has a "disability" is not necessarily based on a diagnosis that a plaintiff suffers from a physical or mental "impairment"; rather, the decision is an individualized inquiry, focused upon the effects that the impairment has on the plaintiff's life. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482-83, 119 S. Ct. 2139, 2146-47, 144 L.Ed.2d 450 (1999); *Pritchard v. Southern Company Services*, 92 F.3d 1130, 1132 n.3 (11th Cir.), *amended on reh'g*, 102 F.3d 1118 (11th Cir. 1996), *cert. denied*, 520 U.S. 1274, 117 S. Ct. 2453, 138 L.Ed.2d 211 (1997). In that regard,

> [a] person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity. To be sure, a person whose physical or mental impairment is corrected by the mitigating measures still has an impairment, but if the impairment is corrected it does not "substantially limit[]" a major life activity.

*Sutton*, 527 U.S. at 482-83, 119 S. Ct. at 2146-47.

Briar contends that his impairments substantially limit the major life activities of sleeping and working. With respect to his argument that his impairments substantially limit sleep, he asserts, without support, that, because he is unable to sleep more than an hour at a time when he is scheduled to work the night shift, he is a danger to co-workers and to the general public. Briar has offered no evidence that demonstrates that his inability to sleep when working the night shift is any worse than the average person who works night shifts, or that his inability to sleep is any worse than the average person in the general population. *See Williams v. City of Charlotte,* 899 F. Supp. 1484, 1488 (W.D.N.C. 1995) (holding that shift work sleep disorder "is nothing more than a commonplace condition which does not precipitate any particular disadvantage"). Briar testified that he was able to compensate for his lack of alertness when assigned to the night shift by drinking coffee and

staying busy.

Moreover, Briar's obstructive sleep apnea was described by Dr. Ozgun, his treating physician, as mild and treatable. Briar did not pursue treatment, however, due to his claustrophobic difficulty in tolerating the CPAP machine. As such, his impairments cannot be considered to substantially limit his ability to sleep.

### a. "Working" as a "major life activity"

"An individual is substantially limited in working if the individual is significantly restricted in the ability to perform a class of jobs or a broad range of jobs in various classes, when compared with the ability of the average person with comparable qualifications to perform those same jobs." 29 C.F.R. pt. 1630 app. at 351 (1999); *see also* 29 C.F.R. § 1630.2(j)(3)(i);[41] *Reed*, 206 F.3d at 1061; *Stewart*, 117 F.3d at 1285 ("When individuals claim that they are substantially limited in the major life activity of 'working,' the condition 'must significantly restrict [their] ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training skills and abilities.'") (quoting *Pritchard*, 92 F.3d at 1133).

"The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i). Instead, an individual is deemed to be substantially limited in his or her ability to perform the major life activity of "working" only if he or she is significantly restricted in the ability to perform either an entire class of jobs, or a broad range of jobs in various classes, as compared to the average person. 29 C.F.R. § 1630.2(j)(3)(i). The

---

[41] 29 C.F.R. § 1630.2(j)(3)(i) provides:
(3) With respect to the major life activity of working—
(i) The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

following factors (along with those listed in *id.* § 1630.2(j)(2)[42]) should be considered in regard to such a claimed limitation:

> (A) The geographical area to which the individual has reasonable access;
>
> (B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills, or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or
>
> (C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills, or abilities, within that geographical region, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. § 1630.2(j)(3)(ii); *see also Gordon*, 100 F.3d at 911-12 (quoting regulations).

For example, in *Bolton v. Scrivner, Inc.*, 36 F.3d 939 (10th Cir. 1994), the Tenth Circuit considered the case of an employee whose employer refused to rehire him following a medical leave of absence, because the employee's doctor concluded that he would not be able to perform the duties of his old job. Despite evidence that the plaintiff was limited in the abilities to stand, walk, or lift objects over his head, the court held that he was *not* significantly restricted in his ability to perform a broad range of jobs in various classes:

> [The] evidence [of plaintiff's impairments] ... does little to show that Bolton is restricted from performing a class of jobs. The evidence does not address Bolton's

---

[42] 29 C.F.R. § 1630.2(j)(1) defines the term "substantially limits"; § 1630.2(j)(2) provides:

(2) The following factors should be considered in determining whether an individual is substantially limited in a major life activity:

    (i)    the nature and severity of the impairment;

    (ii)    The duration or expected duration of the impairment; and

    (iii)    the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

-16-

> vocational training, the geographical area to which he has access, or the number and type of jobs demanding similar training from which Bolton would also be disqualified. Instead, the evidence goes to the nature and severity, duration, and impact of Bolton's impairment — the factors listed in 29 C.F.R. § 1630.2(j)(2). Because Bolton failed to produce evidence showing a significant restriction in his "ability to perform either a class of jobs or a broad range of jobs in various classes," *id.* § 1630.2(j)(3)(i), we affirm the award of summary judgment to Scrivner on Bolton's ADA claim.

*Bolton*, 36 F.3d at 944 (footnote omitted).

Here, defendant's argument that Briar has not established that he is restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes is compelling. Briar does not address either issue, other than making the conclusory assertion that he "has been employed by the defendant for 28 years and has no experience in any other field of employment." Briar's lack of experience in other fields, however, is irrelevant to whether his impairments substantially limit his ability to perform other work. Indeed, Briar has presented no evidence to support a finding that his ability to work is restricted at all, beyond his assertion that he is unable to work at night. In sum, "[t]he inability to work a certain shift, without more, is insufficient to constitute a disability." *Mont-Ros v. City of West Miami*, 111 F. Supp. 2d 1338, 1353 (S.D. Fla. 2000) (citing *Colwell v. Suffolk County Police Department*, 158 F.3d 635, 644-45 (2d Cir. 1998)).

The Seventh Circuit, addressing the claims of truck drivers who suffered limited sleep disorders when assigned to sleeper truck duty, observed "[i]f a job keeps drivers awake, and in turn causes some sort of sleep deficit disorder, it is pretty obvious that the job is the problem, not that the drivers are disabled." *Baulos v. Roadway Express, Inc.*, 139 F.3d 1147, 1153 (7th Cir. 1998). The same logic applies here. Because Briar has failed to present evidence that his impairments substantially limit his ability to work, or any other major life activities, he has failed to establish that

-17-

he is "disabled."

## IV. CONCLUSION

For the foregoing reasons, Briar's claim of discrimination in violation of the ADA must fail, and defendant is entitled to summary judgment. A separate order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this **31st** day of October, 2001.

_____
United States District Judge